IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF MATTIE C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF MATTIE C., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

DIANNE C., APPELLANT, AND KENNETH G., APPELLEE AND CROSS-APPELLANT.

Filed October 7, 2025.    No. A-24-872.

Appeal from the County Court for Scotts Bluff County: KRIS D. MICKEY, Judge. Affirmed.

Helen O. Winston, Scotts Bluff County Deputy Public Defender, for appellant.

Katy A. Reichert, of Holyoke, Snyder, Longoria, Reichert & Rice, P.C., L.L.C., for cross-appellant.

No appearance for appellee.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Dianne C. appeals, and Kenneth G. cross-appeals, from an order of the Scotts Bluff County Court sitting as a juvenile court, terminating their parental rights to their child, Mattie C. Upon our de novo review of the record, we affirm the juvenile court's order.

## II. STATEMENT OF FACTS

Dianne is the biological mother of Mattie, born in June 2020. Dianne and Kenneth were in a romantic relationship before Mattie was born, and in a prior juvenile case, Kenneth was determined to be Mattie's legal father. Mattie's biological father, Juan B., relinquished his parental

- 1 -

rights to Mattie in April 2024 and we only discuss him as necessary to the resolution of the current appeals by Dianne and Kenneth.

## 1. Procedural Background

Mattie was removed from Dianne and Kenneth's care on June 17, 2022, following reports of domestic violence and an incident where Kenneth was intoxicated while driving a vehicle in which Mattie and Dianne's four older children were passengers. An affidavit filed by the Deputy Scotts Bluff County Attorney stated that Dianne's parental rights to her four older children had been terminated in a prior juvenile case in May 2019.

Mattie has not returned to the home since she was removed. Mattie was placed with Juan the day she was removed and remained in his care until April 6, 2023. Mattie was then placed with a foster family due to concerns of physical abuse in Juan's home.

A petition was filed on June 17, 2022, to adjudicate Mattie pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), based on Dianne's failure to provide proper parental care due to her history of domestic violence, history of prior juvenile cases where implemented services had not ameliorated the reasons her children were brought into care, and failure to provide a safe and stable home. The petition also alleged that Kenneth had failed to provide proper parental care to Mattie due to his engaging in domestic violence with Dianne in Mattie's presence and his failure to provide a safe and stable home. The petition also included allegations against Juan. Mattie was adjudicated as to Kenneth on August 10 and as to Dianne on October 6. The adjudication order regarding Dianne references an amended petition, though an amended petition is not included in our record on appeal.

The juvenile court entered a dispositional order on October 24, 2022, adopting the case plan presented by the Nebraska Department of Health and Human Services (the Department). Dianne's case plan goal was to provide a safe and appropriate parenting environment as evidenced by parenting in a sober manner, utilizing a healthy support system, having safe and healthy relationships, demonstrating appropriate parenting skills, and managing her mental health. Kenneth's case plan goal was to work with a network of family and professional support to make a safety plan to demonstrate that he would ask for help when he is struggling with his mental health and desire to consume alcohol. The Department required that Kenneth's safety plan be in place for 6 months prior to any reunification with Mattie. Review hearings were held on December 23, 2022; March 29, 2023; June 28; November 2; January 9, 2024; and March 20. The goals remained consistent during this time.

On February 22, 2024, the State filed separate motions for termination of Dianne's and Kenneth's parental rights to Mattie, alleging statutory grounds to terminate existed pursuant to Neb. Rev. Stat. § 43-292(2) and (6) (Reissue 2016).

## 2. Trial

The termination trial was held over the course of 3 days in May, September, and October 2024.

### (a) Prior Juvenile Case

Kortni Zeiler supervised the caseworkers assigned to a previous juvenile case involving Mattie, Dianne, and Kenneth. Zeiler testified that Mattie tested positive for "THC" at birth in June of 2020. The Department additionally received reports regarding Dianne and Kenneth's relationship, including that Kenneth was charged with third degree assault of a pregnant woman 9 days before Mattie was born. Dianne had an extensive history with the Department, including twelve "accepted intakes" since 2011.

Dianne's most recent case with the Department at that time resulted in Dianne's parental rights to four of her children being terminated in May 2019. The case files relating to Dianne's four other children were entered into evidence and reference that one of Dianne's children, who was 14 months old at the time, had been found unresponsive and submerged in a bathtub filled with water. The child was blue when she was pulled out of the bathtub and was transported to a hospital in Denver, Colorado for medical care.

The family began a voluntary case relating to Mattie with the Department in the summer of 2020 to address concerns related to substance use and domestic violence. The safety plan included that Dianne and Kenneth would complete intensive outpatient treatment, complete intensive family preservation, attend weekly Alcoholics Anonymous meetings, and work with Healthy Families of Americas and the Early Development Network to ensure that Mattie's developmental needs were met. The Department also instructed Dianne and Kenneth to obtain substance use evaluations.

Zeiler described Dianne and Kenneth's compliance with the voluntary case as minimal, with intensive family preservation discontinuing their service to the family due to a lack of attendance at scheduled sessions. Dianne did meet with a worker from the Early Development Network in August 2020, who expressed concerns that Dianne's substance use "seemed to be intractable." The worker also noted that Dianne seemed to have difficulty following through on meeting Mattie's needs. Zeiler received documentation that Dianne participated in an intensive outpatient treatment for her substance use beginning in July 2020 and graduated from the program in November. Zeiler did not receive any documentation regarding whether Kenneth had engaged in any programming to address his substance use.

In connection with the previous case, Mattie was ultimately removed from the home on September 2, 2020, and a juvenile petition was filed. An affidavit in support of custody, authored by a Department caseworker, stated that temporary protective custody of Mattie was necessary due to concerns of substance use in the home as well as a "lack of willingness to address the concerns through a voluntary case[.]" Zeiler testified that during this juvenile case, the Department offered medication management, family support, 30 hours of visitation, financial assistance, and the Circle of Security parenting program. The Department also encouraged Dianne and Kenneth to attend Alcoholics Anonymous and couples counseling. Zeiler did not receive any documentation to indicate that Dianne and Kenneth were participating in couples counseling. Mattie was placed back in the home on March 3, 2022, and the juvenile case was closed the same month.

### (b) Present Juvenile Case

Karissa Harvey, the family's caseworker since July 2022, testified that at the beginning of the case at issue, the Department had concerns regarding Dianne's and Kenneth's alcohol use,

domestic violence, and prior case history (discussed above). Following a Family Strengths and Needs Assessment, the family's needs were identified as "substance use, household relationships, coping skills, and parenting skills."

Harvey testified that the Department offered family support, supervised parenting time, drug testing, child-parent psychotherapy (CPP), a referral to the Early Development Network, intensive family preservation, Circle of Security, and intensive outpatient programming. The Department also provided cell phones, cleaning supplies, bus passes, gas vouchers, and a bed with bedding for Mattie.

Harvey testified that Dianne achieved stable housing approximately 6 months prior to trial. She has had multiple jobs throughout the case, which she has not been able to maintain. Kenneth has had stable housing as well as consistent employment throughout the case.

### (c) Dianne and Kenneth's Relationship

Kenneth testified that when Mattie was born, he and Dianne were in a romantic relationship, and he believed that Mattie was his biological child. Kenneth "never stopped loving" Mattie, even after he learned in the prior juvenile case that paternity testing established that Juan was Mattie's biological father. At that point it was also determined that Kenneth was Mattie's legal father.

Kenneth and Dianne's romantic relationship ended in September of 2022. Kenneth had consistently provided Dianne with food to take to her parenting time with Mattie and had given Dianne rides to the visitation center and the store. Kenneth had also given Dianne a ride over the lunch recess of one of the days of trial. Dianne testified that she and Kenneth speak nearly every day.

Harvey was not able to speak to the status of Dianne and Kenneth's relationship at the time of trial. She noted that they refer to one another as co-parents or as part of their support system, though she has "not been able to get a solid truth." Harvey testified that both parents had regularly shown up at one another's individual visits with Mattie within the past 6 months.

The Department had discussed Dianne and Kenneth attending couples counseling at the beginning of the case. Dianne indicated to Harvey that she had a therapist selected to work with Dianne and Kenneth. Harvey invited this therapist to a family team meeting in March 2024 to explain the specific skills she was working on with Dianne and Kenneth to address their co-parenting dynamics. However, all the therapist's updates were focused on Dianne individually and the therapist did not mention co-parenting or any couples counseling work.

Dianne utilizes Kenneth as a support, which is concerning to Harvey because the two have had a "very volatile relationship which has impacted Mattie." Harvey testified that Mattie has been exposed to their arguments and yelling. Harvey noted that both Dianne and Kenneth have limited support networks.

### (d) Substance Use

Harvey testified that substance use was an issue for both parents during the juvenile case. Dianne began drug testing following disposition, but Kenneth did not begin drug testing until August 2023 following a therapeutic recommendation. Throughout the case, sweat patches, breathalyzers, urine analysis, and a hair follicle test were utilized.

Dianne had positive drug tests throughout the case. From December 2022 to March 2023, only five sweat patches were able to be collected as Dianne was either removing or refusing to wear the patches. Of the five collected, four were positive for "meth and THC." A hair follicle test was conducted for Dianne in January 2023, which was positive for methamphetamines and THC.

Dianne went to residential treatment at Sunrise Place in Norfolk on March 16, 2023, for a 30-day program. Dianne did an initial drug test when she entered the treatment facility and tested positive for methamphetamine, "benzos, THC, and she also had a BAC of .110." Dianne completed the short-term treatment and transitioned to a long-term residential treatment program on April 12, 2023. She was unsuccessfully discharged from Sunrise Place on May 1.

Dianne resumed regular drug testing following her return from Sunrise Place. Harvey testified that Dianne was given three sweat patches in June 2023, and all of them were positive for methamphetamine. Dianne tampered with one of her sweat patches in July, which resulted in a presumed positive. Dianne was able to sustain a period of sobriety from August 2023 to April 2024. On May 2, 2024, one of Dianne's sweat patches tested positive for methamphetamines and amphetamines. In June 2024, Dianne was given four sweat patches and tested positive for methamphetamine and amphetamine twice and for cocaine once. In July, five sweat patches were given, and Dianne tested positive for methamphetamine and amphetamine once. In August, four sweat patches were given, and Dianne tested positive for methamphetamine and amphetamine three times and THC once.

Dianne was also given near daily tests for alcohol, initially using a breathalyzer. However, the Department began using urine analysis instead of a breathalyzer in January 2024 out of concerns that Dianne's positive breathalyzer results were due to her use of an albuterol inhaler. Dianne tested positive for alcohol consumption once in January 2024, once in April, twice in May, once in June, and she refused urine analysis twice in July. From August until trial Dianne tested negative for alcohol.

Harvey testified that Dianne did not engage in any services to address her substance use after leaving Sunrise Place. Dianne saw multiple therapists throughout the case, though none of them consistently. Harvey also noted that Dianne's home has a strong odor of marijuana.

Harvey testified that the Department's primary concern for Kenneth was his alcohol consumption, particularly since Kenneth had received a citation for driving under the influence while he was driving a vehicle with Mattie and Dianne's four other children inside.

Kenneth began testing for alcohol in August 2023 after there was a concern that Kenneth had shown up for CPP intoxicated. A family support worker made contact with Kenneth that day and his breathalyzer result was ".40." Since that time, Kenneth has been completing weekly sweat patch testing as well as a breathalyzer test four times a week. Kenneth produced negative breathalyzer results until December when he had two positive tests. Kenneth tested negative on the breathalyzer from January to March 2024. Kenneth then had five positive results in April, was negative in May, and had 11 positive results in June. Kenneth reported to Harvey that he did not understand why he was having positive breathalyzers, as he was not drinking. Kenneth has not tested positive on the breathalyzer since June 2024. Kenneth has never had a positive sweat patch result.

Harvey testified that Kenneth had completed outpatient treatment programming for his alcohol use, though the dates that Kenneth participated in the programing were not provided.

(e) Parenting Time

At the beginning of the case in June 2022, Dianne received 30 hours of supervised parenting time a week. Initially parenting time occurred in Dianne and Kenneth's home. Each parent received their own individual supervised parenting time due to concerns that Kenneth and Dianne were engaging in verbal altercations during Dianne's parenting time with Mattie. The Department was also concerned about Dianne and Kenneth's boundaries, as there were instances of Kenneth showing up to Dianne's individual parenting time.

Dianne was evicted from the home in the fall of 2022, and parenting time was moved to a visitation center. Mattie appeared to have fewer behaviors when the parenting time occurred at the visitation center due to Mattie's need for a consistent, regulated, and neutral environment. Harvey testified that for the majority of the case, the visitation center was the most appropriate place for parenting time with Mattie as there were concerns that Dianne had been twice evicted during the pendency of the case and was staying with various people, including moving back in with Kenneth at one point.

In March 2023, Dianne's supervised parenting time was decreased from 30 hours a week to 20 hours due to concerns of inconsistent attendance and because Dianne was discussing the juvenile case during parenting time and in Mattie's presence. For instance, Dianne would make phone calls to different service providers or case professionals. The phone calls would escalate, and Dianne would become aggressive. There were also reports during this time that Dianne was "verbally abusive and aggressive" toward the family support workers. When Dianne was loud and aggressive during visits, Mattie would tell Dianne to stop yelling or would have temper tantrums. Mattie also began to mimic Dianne's cursing and would direct foul language at authority figures leading to concerns regarding Mattie's exposure to Dianne's behavior and language.

Roughly a week after the reduction to 20 hours a week, Dianne's supervised parenting time hours were further reduced to 15 hours a week following an incident where Dianne was unable to be redirected or calmed down in a public setting. Harvey testified that the Department reduced Dianne's hours "because it seemed like things were escalating instead of resolving." In April 2023, Dianne entered Sunrise Place to address her substance use. There, Dianne was allowed one 15-minute supervised virtual visit with Mattie a week.

Harvey testified that Dianne left this treatment in May 2023 out of concerns that her 15-minute virtual visitations would impact her relationship with Mattie. Harvey stated that had Dianne stayed in the long-term program for a sufficient period, Mattie would have been able to join Dianne at Sunrise Place through their Mommy & Me program.

Dianne was then incarcerated in June 2023 for roughly a month on charges of assault and disturbing the peace. In an order entered by the juvenile court on June 28, the court suspended parenting time with all parents until further order. In an order entered on August 9, the court ordered Dianne to engage in therapeutic visits by participating in CPP. The court also resumed Dianne's 15-minute supervised virtual visits.

Harvey testified that in January 2024, Dianne was able to resume having 3 hours a week of supervised parenting time. On February 22, the court ordered that supervised parenting time for all parents be restricted to 1 hour a week per parent. At the time of trial, Dianne was still having just 1 hour of supervised parenting time with Mattie a week.

Kenneth was not able to have supervised parenting time with Mattie until July 2022 due to Dianne seeking a protection order against Kenneth. Harvey testified that the protection order was later vacated, and Kenneth was then granted 15 hours of supervised parenting time a week. From July to December, Kenneth's supervised parenting time occurred in his own residence. Kenneth's parenting time was moved to a visitation center in December due to concerns regarding the cleanliness of his home and that Kenneth was unable to take redirection from family support workers regarding Mattie's behavior. After Kenneth secured more stable housing in November 2023, the Department tried to move his supervised parenting time to his residence, but "eventually had to move them back to the visitation center" by February 2024. It is unclear from our record why Kenneth's parenting time was moved back to the visitation center.

In December 2022, Kenneth's supervised parenting time hours increased to 20 hours. Following the suspension of parenting time discussed above, Kenneth continued participating in therapeutic visitation during CPP with Mattie. Kenneth's supervised parenting time was then changed to 3 hours a week in November 2023, before both parents' supervised parenting time was reduced to 1 hour a week in February 2024.

Throughout Kenneth's parenting time with Mattie, there was concern regarding Kenneth's ability to maintain consistent boundaries for Mattie. Kenneth resisted telling Mattie "No," and when he would deny Mattie, she would have "severe tantrums," including yelling, crying, and throwing things. Harvey testified that Kenneth struggled with approaching Mattie to help her regulate. Kenneth participated in CPP as well as in the Circle of Security and Love and Logic programs. Kenneth received redirection during parenting time from the family support worker and parenting recommendations during family team meetings. Harvey testified that an ongoing concern was that Kenneth had not been able to learn the skills to help Mattie regulate and meet her emotional needs.

A family support worker who began supervising Kenneth's parenting time in May 2024 testified that Kenneth's parenting time had gone well, with the worker helping Kenneth setting limits and making sure he was in control of the visit.

Though neither parent missed any supervised parenting time from June to December 2022, from December 2022 to March 2023, Dianne did not attend 13 of her scheduled visits. Also, during this time period, three of Dianne's visits were ended early by family support workers due to Dianne's aggressive behavior. Between March and June 2023, Kenneth ended four visits early because he was tired. Dianne's and Kenneth's parenting time attendance improved following the summer of 2023 and had been consistent until the time of trial. Additionally, Dianne and Kenneth consistently provided food and age-appropriate activities for Mattie, as well as showing her physical affection during their parenting time with her.

Harvey testified that neither parent had progressed to have unsupervised parenting time. Dianne had semi-supervised parenting time at the very beginning of the case when visits were still in the home. She has not had any semi-supervised parenting time since visits moved to the visitation center in late 2022. Kenneth has never had semi-supervised or unsupervised parenting time with Mattie. Harvey testified that Mattie had "pretty severe behaviors," and those have improved as parenting time hours have decreased.

## (f) Mattie's Therapeutic Needs

Lori Rodriquez-Fletcher has been Mattie's therapist since May 2023. Rodriquez-Fletcher worked with Mattie both individually and facilitated CPP with both Dianne and Kenneth. Following an initial diagnostic interview, Rodriquez-Fletcher diagnosed Mattie with post-traumatic stress disorder, parent-child relationship problems, exposure to THC and alcohol, and child abuse. When Rodriquez-Fletcher first began seeing Mattie, she was easily dysregulated and irritable. She needed a lot of sleep but slept poorly and had bad dreams. Mattie was easily fearful, anxious, sad, hypervigilant, and tearful. She was clingy with her foster parents and exhibited regressive behaviors, such as "baby talk." Mattie also experienced several physical symptoms like stomachaches and headaches. When playing with a baby doll during her sessions with Rodriquez-Fletcher, she would yell at the doll, put it in cold water, and spank it. Rodriquez-Fletcher believed that Mattie's play was based on her own experiences.

Rodriquez-Fletcher identified concerns within the relationship that Mattie has with each of her parents. Rodriquez-Fletcher first met with Dianne in parent-only sessions in August 2023 to assess her safety, as Rodriquez-Fletcher identified some problematic interactions with Mattie after reading visitation notes from Dianne's parenting time. Rodriquez-Fletcher completed a child-parent relationship assessment in October, then started doing a combination of parent-only sessions with Dianne and CPP with both Dianne and Mattie. The assessment was the first time Dianne and Mattie had seen each other for a while and so both were anxious. Mattie was at first avoidant of Dianne, but after some time began to play and interact with Dianne. The assessment revealed that Mattie did not have a safe, secure attachment to Dianne, and Rodriquez-Fletcher identified this as an area of growth. Dianne's CPP goals included building trust in the relationship with Mattie, being able to consistently read Mattie's cues and respond appropriately, and developing nurturing skills.

In early CPP sessions, Rodriquez-Fletcher noticed that Mattie was consistently anxious around Dianne and did not try to engage her in play. Mattie seemed calmer when Dianne was not in the room. Over time, Mattie and Dianne became more comfortable with each other, their interactions improved, and they had less anxiety. Dianne was receptive to Rodriquez-Fletcher's insights that Mattie's play during CPP sessions with Dianne demonstrated that Mattie's early life had been chaotic. Rodriquez-Fletcher observed that while Dianne made some improvements with regular consistent play, there always seemed to be a "disconnect" between Dianne and Mattie.

Rodriquez-Fletcher believed that Dianne had emotionally abused Mattie. During CPP sessions, Dianne would make comments to Mattie about Mattie being overweight, mocking Mattie's clothing and shoes, and would have negative reactions if Mattie would call her foster parents "mom and dad."

During parent-only sessions, Rodriquez-Fletcher briefly addressed Dianne's mental health, trauma, substance use, and relationship concerns. Dianne reported that she was doing her own therapy. Dianne referred to her relationship with Kenneth as "toxic," but she continued to utilize him as her main support.

After additional hours of Dianne's supervised parenting time were added in January 2024, Mattie became incredibly dysregulated in several areas of her life, including with both Dianne and Kenneth, at school, and at her foster home. In February and March, Mattie began to struggle and

was experiencing increased anxiety, dysregulation, and regression. There were reports that Mattie was physically aggressive when she was dysregulated at school, leading to her hitting other children, pulling their hair, and running out of her classroom. Mattie had also hit a paraprofessional. Mattie's pediatrician was concerned about her levels of anxiety and asked Rodriquez-Fletcher about the amount of parenting time Mattie was having and how it was affecting her. Rodriquez-Fletcher ultimately recommended a reduction in parenting time.

Because Rodriquez-Fletcher felt that there was too much happening for Mattie and that the therapeutic process needed to slow down, she planned to pause CPP and work with Dianne in parent-only sessions. Rodriquez-Fletcher testified that after making her recommendations, Dianne's emotional state shifted and she began to display blame and hostility. Dianne repeatedly called Rodriquez-Fletcher and would rant at her voicemail. When Rodriquez-Fletcher called Dianne back, Dianne would not allow Rodriquez-Fletcher to speak and was focused on what Rodriquez-Fletcher said or did not say to Kenneth. Rodriquez-Fletcher recalled that Dianne did not appear to be concerned about Mattie, nor would Dianne take any accountability. Dianne blamed Harvey for the slow therapeutic progress.

Rodriquez-Fletcher felt that Dianne had a lot of individual therapeutic work to do and terminated services with her. Rodriquez-Fletcher stopped doing CPP with Mattie and Dianne in February 2024.

Rodriquez-Fletcher began working with Kenneth in May 2023 and completed a child-parent relationship assessment in June. Rodriquez-Fletcher observed Kenneth to be loving toward Mattie but that he struggled with setting appropriate boundaries and limits with her. During sessions Kenneth would get Mattie overly excited by tickling her excessively or throwing her in the air and Mattie would then have a hard time regulating. Rodriquez-Fletcher testified that when Mattie would struggle with being dysregulated, Kenneth was unsure how to approach Mattie. Kenneth struggled to maintain limits and boundaries and would give in to Mattie to keep her from getting further dysregulated. Kenneth would use either bribes or scare tactics to get Mattie to comply with his directions.

Mattie also exhibited several regressive behaviors around Kenneth, such as using baby talk, refusing to walk, and insisting on being carried. Rodriquez-Fletcher testified that Mattie's regressive behaviors with Kenneth indicated an insecure attachment to him. In their interactions, Rodriquez-Fletcher could see Mattie trying to get some sort of need met. Kenneth either did not see an issue with Mattie's regressive behaviors or would reinforce the behavior by making comments that Mattie is his baby.

Rodriquez-Fletcher testified that children exhibit regressive behaviors when they have experienced trauma, and they "get stuck" in the period of development where the trauma took place. Mattie struggled in relationships because she did not have any permanency. Rodriquez-Fletcher noted that Mattie was trying to fulfill her need of a consistent, long-term caregiver.

Though Rodriquez-Fletcher was concerned that Mattie was exposed to THC as an infant, she did not observe Mattie to have any cognitive or developmental delays, noting that she is very smart and articulate. When Mattie was with her foster parents, her development and speech were advanced for her age. However, Mattie exhibited regressive behaviors in the presence of her parents, particularly with Kenneth.

From May 2023 to March 2024, Rodriquez-Fletcher worked with Kenneth on improving his relationship with Mattie and helping Kenneth to understand Mattie's needs and to read her cues, and then respond appropriately. Rodriquez-Fletcher provided significant developmental guidance and education regarding how Mattie's trauma affected her. She worked on applying the material Kenneth had learned in Circle of Security. In parent-only sessions, Rodriquez-Fletcher addressed her concerns regarding his alcohol use and his relationship with Dianne.

Though Kenneth initially made slow progress in CPP, by February 2024 things had started to "escalate and kind of backtrack." Mattie had challenging CPP sessions with Kenneth on February 21 and March 13. In both, Mattie was dysregulated, exhibiting regressive behaviors, and did not want to interact or play with Kenneth. She was highly emotional and defiant: kicking her feet, throwing off her shoes, throwing toys, rolling around on the floor, and pulling out her hair. The sessions escalated to the point of Mattie throwing a tantrum. Rodriquez-Fletcher had to spend time after Kenneth left the session regulating Mattie before she went back to school.

Because both Mattie and Kenneth were struggling during this time, Rodriquez-Fletcher decided to pause CPP while Rodriquez-Fletcher worked with Mattie individually. Though Rodriquez-Fletcher was still willing to do parent-only sessions with Kenneth, he became very angry and no longer wanted to work with Rodriquez-Fletcher. According to Rodriquez-Fletcher, Kenneth did not understand why case professionals had an issue with his relationship with Dianne, as previous domestic violence charges filed against him had been dropped. At this time, Kenneth struggled to take feedback on his parenting; calling Rodriquez-Fletcher or the Department "evil," making references to "judgment days," saying that there was nothing wrong with him, and denying that he had an issue with alcohol or needed to participate in individual therapy. Rodriquez-Fletcher testified that Kenneth displayed a lot of denial and avoidance.

Rodriquez-Fletcher saw Mattie and Kenneth together for the last time on March 13, 2024. She conducted a parent-only session with Kenneth on March 27 and then shifted to individual therapy with Mattie.

During a family team meeting in August 2024, Rodriquez-Fletcher asked a family support worker who was supervising parenting time if Mattie had been exhibiting regressive behaviors as Rodriquez-Fletcher had not observed any in her individual therapy sessions since the end of March. The family support worker stated that she did not realize that Mattie's normal voice did not sound like baby talk, as she had been speaking that way during parenting time. Kenneth denied that Mattie was using baby talk, saying instead that Mattie was speaking that way because she had a popsicle in her mouth. When Rodriquez-Fletcher and Harvey later tried to address Mattie's speech with Kenneth, he said nothing was wrong and that Rodriquez-Fletcher makes "issues out of nothing" and that was why he did not want to work with her.

At the time of trial, Rodriquez-Fletcher was still seeing Mattie for individual therapy. She reported that Mattie was generally doing well and enjoys coming to therapy. Mattie's play is more organized, she is less anxious, and seems overall happier. Mattie is also doing better in school. Mattie's current preschool teacher testified that after the first month of the school year, she had no concerns regarding Mattie's ability to learn, emotional stability, or behaviors while in the classroom.

After reviewing recent visitation notes, Rodriquez-Fletcher's concern regarding Dianne was that Mattie does not have a safe, secure attachment to Dianne. Rodriquez-Fletcher also noted

that Dianne is sometimes late for parenting time or does not have food prepared and will have Kenneth or someone else drop off food for Mattie. Rodriquez-Fletcher also had lingering concerns around Dianne's relationship to Kenneth, her mental health, emotional reactivity, and her inability to take feedback. Recently Rodriguez-Flecher's office had to call Dianne's attorney to say that they would contact law enforcement if Dianne continued to call and harass the office staff.

Rodriquez-Fletcher's main concern with Kenneth was that Mattie is still exhibiting regressive baby talk during parenting time and that Kenneth struggles with boundaries. Rodriquez-Fletcher did not believe that Mattie has a secure attachment to Kenneth despite their positive interactions. Kenneth and Mattie love each other, but Rodriquez-Fletcher was concerned about Kenneth's ability to take care of Mattie full-time by himself if he is not recognizing that Mattie is 4 years old and that her behaviors are regressive and not age appropriate. Rodriquez-Fletcher also noted Kenneth's resistance to addressing his alcohol use and mental health concerns. Though Kenneth made some improvements during their time together, Rodriquez-Fletcher testified that it had been very slow and was not to the level Rodriquez-Fletcher would have liked, given the amount of time she worked with Kenneth.

Rodriquez-Fletcher observed that Mattie continues to have an anxious-disorganized attachment to both parents. Mattie does not fully trust people and she worries about who will care for her. Rodriquez-Fletcher noted that during sessions, Mattie never says she wants to be with Dianne or Kenneth.

Rodriquez-Fletcher testified that if the parent-child relationship issue is not appropriately addressed, Mattie is at a high risk for further mental health issues, substance abuse issues, and academic or legal issues. Rodriquez-Fletcher noted that Mattie has spent the majority of her life in the custody of the Department. Rodriquez-Fletcher opined that Mattie needs permanency in order to address her trauma and create a healthy attachment to a caregiver. Rodriquez-Fletcher stated that both Dianne and Kenneth have an "incredibly large amount" of individual work they need to do before they could securely parent and attach to Mattie and have Mattie trust that they can keep her safe and protect and provide for her.

(g) Overall Case Progress

Harvey stated that both parents had made poor progress throughout the case. Dianne had not met any of her case plan goals. At the time of trial, the Department was concerned that Dianne was unable to maintain her sobriety and progress beyond 1 hour of fully supervised parenting time a week. Also, Dianne had not addressed her relationship with Kenneth and how the relationship's volatility had impacted Mattie. Dianne had not followed through with intensive outpatient programming or completed long-term residential treatment to manage her substance use. Harvey believed that Dianne had not yet developed healthy coping skills or built a support system. Harvey was also concerned about Dianne's "lengthy history" with the Department, as Mattie had only lived 6 months of her life out of the care of the Department.

Harvey testified that her main concern regarding Kenneth was his inability to understand parenting tactics and to take the recommendations from Rodriquez-Fletcher in order to ensure that Mattie has consistent parenting. Harvey stated that Mattie's behaviors were related to her not getting her emotional needs met and that it was concerning that Kenneth was unable to follow recommendations given to him by a therapist or parenting program.

Harvey testified that another barrier to case progress for Kenneth was his inability to acknowledge the concerns that the Department was trying to bring to his attention, particularly his inability to redirect Mattie appropriately. Harvey noted that because Kenneth resisted being an authority figure with Mattie there was a lack of parental boundaries which could lead to safety issues. Finally, though Kenneth had completed outpatient programming, Harvey was concerned that he had produced several recent positive tests in June 2024. Harvey was unsure whether Kenneth could maintain his sobriety.

Both Dianne and Kenneth testified to their love for Mattie, though Dianne's testimony was disjointed and hard to follow at times. We also note that Dianne exhibited disruptive behavior throughout the termination trial, including arriving after the proceedings had begun, speaking over and interrupting testimony, and behaving combatively with witnesses.

### 3. ORDER

Following the termination hearing, the juvenile court entered an order on November 13, 2024, terminating Dianne's and Kenneth's rights to Mattie. The court found that the State had met its burden of proving grounds for termination under § 43-292(2) and (6). The court noted that testimony of Harvey and Rodriquez-Fletcher was "particularly credible and compelling." The court further found that "Dianne and Kenneth demonstrated cyclical inconsistency, a lack of sustained commitment to rehabilitate themselves, and an absence of motivation to accomplishing the goals of their respective case plans" and that it was in Mattie's best interests to have Dianne's and Kenneth's parental rights terminated.

Dianne appeals, and Kenneth cross-appeals.

### III. ASSIGNMENTS OF ERROR

Dianne assigns, restated, that the juvenile court erred in (1) finding that there was clear and convincing evidence that statutory grounds for termination existed, and (2) finding that it was in the best interests of the child to terminate her parental rights.

Kenneth cross-appealed, assigning, restated, that the juvenile court erred in (1) finding that there was clear and convincing evidence that statutory grounds for termination existed, and (2) finding that it was in the best interests of the child to terminate his parental rights.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

### 1. STATUTORY GROUNDS

#### (a) § 43-292(7)

We begin by noting that while the State did not allege statutory grounds to terminate existed under § 43-292(7), Mattie had been in out-of-home placement for 15 or more months of the most recent 22 months at the time the motions to terminate were filed.

During the termination trial, the juvenile court inquired as to the number of months Mattie had been in out-of-home placement. The State responded that because Mattie was removed on June 17, 2022, she had been a "ward of the state" for approximately 24 months (presumably from the time of Mattie's removal to the start of the termination trial in May 2024). However, because Mattie was placed with Juan from June 2022 until April 2023, the State responded that Mattie had only been out of the home for approximately 13 months.

"Out-of-home placement" for purposes of Neb. Rev. Stat. § 43-292(7) (Reissue 2016) focuses on the parent whose parental rights are at risk of being terminated. From that perspective, "out-of-home placement" includes any placement outside that parent's home, whether that is placement in foster care, with a guardian, or with anyone other than the parent at issue. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). The Nebraska Supreme Court has held:

> The focus of § 43-292(7) is on the parent whose rights are at issue and whether that parent has made progress in rehabilitating himself or herself, and we therefore conclude that a placement outside that parent's home, even if with another parent, is an "out-of-home placement" under § 43-292(7).

*In re Interest of Jessalina M.*, 315 Neb. at 544, 997 N.W.2d at 785.

Applying the foregoing authority to the instant case, Mattie was in "out-of-home placement" as to Dianne and Kenneth during any time that she was not placed with them, including the time that she was under the custody of the Department and was placed with Juan, Mattie's biological father. Mattie was removed from Dianne's and Kenneth's care on June 17, 2022, and has remained out of their home since her removal. The State filed the motions for termination of parental rights on February 22, 2024. The existence of the statutory basis alleged § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. See *In re Interest of Jessalina M., supra*. At the time of filing, Mattie had been in out-of-home placement for over 20 months. Thus, the statutory requirement for termination under § 43-292(7), if alleged, would have been met. We turn to the statutory bases that were alleged and found to be proven by the juvenile court.

#### (b) § 43-292(2)

In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the children's best interests. See *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). One such ground is when the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary

- 13 -

parental care and protection. *Id*. Past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under § 43-292(2). *Id*. One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2). *Id*.

Dianne argues that the evidence at trial did not demonstrate that Dianne neglected or refused to care for Mattie, as she consistently attended parenting time with food and appropriate activities and consistently attended sessions with Rodriquez-Fletcher.

Kenneth argues that throughout the case he consistently demonstrated appropriate and affectionate parenting. He maintained stable housing and steady employment throughout the duration of the case and complied with court-ordered services and actively participated in his case plan, including parenting programming. Kenneth asserts that the evidence established he posed no safety risk to Mattie.

Dianne has been unable to sustain any kind of stability or progress throughout the juvenile case. Dianne has struggled with her substance use throughout the case. Upon her arrival at Sunrise Place, she tested positive for methamphetamine, benzodiazepine, THC, and had a blood alcohol content of 0.11. Though Dianne successfully completed short-term treatment at Sunrise Place, she left long-term treatment shortly after her transition to that program, saying that she wanted to pursue reunification with Mattie in Scotts Bluff County. We are troubled that Dianne would not consider participating and successfully graduating from long-term treatment as a pivotal step to achieving reunification with Mattie. Though Dianne was able to sustain a period of sobriety for 8 months from the fall of 2023 to the spring of 2024, drug tests in the summer of 2024 indicated she was using methamphetamine, amphetamines, and cocaine around the time of the termination trial and over 2 years after Mattie had been removed from the home.

Though Kenneth did not begin drug testing until August 2023, the reason the testing was initiated was because Kenneth showed up for a CPP session heavily intoxicated. Kenneth was likewise able to maintain sobriety for a period of several months. However, Kenneth's breathalyzer tests produced five positive results in April 2024 and 11 positive results in June. Again, these positive results occurred nearly 2 years into the commencement of this juvenile case.

Throughout this case, Dianne and Kenneth have consistently attended their visits; however, those visits have been reduced to both parents having only 1 hour of visitation per week. This came as a result of a therapeutic recommendation based on Mattie's behaviors in a variety of settings. Rodriquez-Fletcher spoke extensively about the behaviors Mattie exhibited during the process and why the reduction in time was necessary to protect the child. During Rodriquez-Fletcher's time with the parents, they exhibited little insight into what was happening with Mattie and how to accompany her through her trauma. Kenneth would either deny that Mattie's regressive behaviors were occurring or would reinforce the behaviors. When Rodriquez-Fletcher paused CPP sessions with Dianne in order to keep Mattie emotionally and physically safe, Dianne responded aggressively by continuously calling to harass Rodriquez-Fletcher and her office staff. At no point during this case did visits progress to unsupervised or overnight visits. Neither parent has exhibited a sufficient ability to provide an environment where Mattie can be safe.

The neglect of Mattie has been continuous as she was previously removed from the home as an infant and then placed back in the home for just 3 months before the petition in this juvenile case was filed. Though Mattie was 4 years old at the time of trial, she had spent only 6 months out

of the care of the Department. Dianne and Kenneth have shown minimal improvement in their ability to provide safety and stability for Mattie.

Because the State presented clear and convincing evidence that Mattie had been substantially and continuously or repeatedly neglected and refused necessary parental care and protection, statutory grounds for termination of Dianne's and Kenneth's parental rights exist regarding Mattie. If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

## 2. PARENTAL UNFITNESS AND BEST INTERESTS

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). In light of the constitutionally protected nature of the parent-child relationship, there is a rebuttable presumption that it is in the child's best interests to share a relationship with his or her parents. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). The presumption that it is in the child's best interests to share a relationship with his or her parent can only be overcome by a showing that the parent either is unfit to perform the duties imposed by the relationship or has forfeited that right. *Id*. Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al., supra*.

Dianne argues that both Harvey and Rodriquez-Fletcher acknowledged that Dianne was affectionate and loving toward Mattie. Dianne asserts that she obtained long stretches of sobriety, maintained employment, and found a place to live, "even if those things were fleeting at certain periods." Brief for appellant at 13. Dianne contends that she demonstrated a strong interest in trying to maintain her relationship with Mattie.

Kenneth argues that he consistently provided appropriate care, affection, and support to Mattie, and that his parenting skills were improving. He contends that he engaged in all services recommended or offered by the Department. Keneth asserts that the juvenile court's concerns related to Kenneth's fitness appear to have stemmed largely from broader family dynamics and issues of co-parenting with Dianne, rather than from Kenneth's individual parenting capabilities or conduct.

Rodriquez-Fletcher testified at length concerning the extreme dysregulation and emotional neediness she observed in Mattie when around Dianne, and to Dianne's own dysregulation, verbal aggression and inability to be redirected. Rodriquez-Fletcher also testified to the struggles she

observed with regard to Kenneth setting boundaries and recognizing Mattie's behavioral and emotional cues. Rodriquez-Fletcher specifically testified that Mattie has an anxious and disorganized attachment, as opposed to a secure attachment, to Dianne and Kenneth. Rodriquez-Fletcher stated that Mattie needs permanency in order to address her trauma and create a healthy attachment to a caregiver.

Visitation had to be steadily reduced at the recommendation of Rodriquez-Fletcher, to the point that each parent had only 1 hour of visitation per week. At no point did visitations progress to unsupervised or overnight visits. Neither Dianne nor Kenneth has exhibited the sustained capacity and stability to provide for Mattie's basic needs.

As noted above, Mattie is 4 years old and has spent only 6 months of her life without the Department's intervention. This is her second time in out-of-home care. Dianne has a long-standing history with the Department, which has resulted in the termination of parental rights to four older children. Both parents have been given over 2 years to work on a case plan and have had more than sufficient time to show meaningful progress with the case plans. However, neither parent has been able to accomplish the requirements of the goals and case plans.

Based on the evidence presented, there has been minimal change over the course of the case in Dianne's and Kenneth's ability to acknowledge Mattie's trauma and to parent Mattie in a way that supports her emotional needs. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015).

Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Mattie has been in out-of-home care since June 2022. Rodriquez-Fletcher testified to her increased need for permanency due to her trauma history, diagnoses, and behavioral needs. Mattie deserves stability and should not linger in foster care while Dianne and Kenneth are unable to rehabilitate themselves. Accordingly, we find there was clear and convincing evidence to show that Dianne and Kenneth were unfit and that terminating their parental rights was in the child's best interests.

## VI. CONCLUSION

Upon our de novo review of the record, we conclude the State proved by clear and convincing evidence that grounds for termination of Dianne's and Kenneth's parental rights existed under § 43-292(2) and that termination of their parental rights is in the child's best interests. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.